Isidoro Infante et ux., Plaintiffs and Appellants, *v.* Bob Leith et al., Defendants and Appellees.

No. 12352. Decided March 15, 1962.

*R.. Arjona Siaca* for appellants. *F. Fernández Cuyar* and *Rafael A. González* for appellees.

Division composed of Mr. Justice Belaval, as Chief Judge of Division, Mr. Justice Hernández Matos and Mr. Justice Santana Becerra.

MR. JUSTICE HERNÁNDEZ MATOS delivered the opinion of the Court.

Appellants Isidoro Infante and his wife Mercedes Sánchez resided on February 14, 1955 in Villa Caparra Development of the Municipality of Guaynabo. Nearby were the residences of appellees Bob Leith and Richard Penn. The former were the owners of a small fox-terrier dog called Nerón, which had been given to them ten years ago by a friend. Bob Leith was the owner of Blackie, a big police dog. Richard Penn was the owner of Pennie, a female police dog, also a big one.

In the afternoon of that day and while Mrs. Infante was in her home, Blackie and Pennie trespassed on the yard of the residence of the spouses Infante-Sánchez where Nerón was digging a hole to hide a prey. Both attacked Nerón, biting him again and again, shaking him "as if trying to split him in two." (Tr. Ev. 7.) What remained of the unfortunate Nerón was removed to the veterinary hospital of Dr. López Pacheco, where he was operated under general anesthesia and given oxygen during the three hours of the operation, and afterwards antibiotics for several days.

Based on this assault and other trespasses and prior behavior of the appellees' animals, the spouses Infante-Sánchez brought an action against the owners to recover the resulting damages and praying for an order to maintain their respective dogs within their premises.

The defendants answered challenging the sufficiency of the complaint, denying in general the principal allegations, and alleging that the accident was due to the negligence of the plaintiff spouses or to a fortuitous or inevitable act.

The trial having been held and the case submitted for decision, the trial court rendered judgment awarding to the plaintiffs only the expenses incurred in curing their small dog, amounting to $98, plus the costs and $140 for attorney's fees. It made the following findings:

"FINDINGS OF FACT.—The plaintiffs are husband and wife, they reside in Villa Caparra Development of Guaynabo, and are the owners of a fox-terrier dog 10 years old on which they lavish great care and affection.

"On February 14, 1955, a big dog owned by Richard Penn and another big dog owned by Bob Leith trespassed on the yard of the plaintiffs' home and attacked their small dog, producing three big wounds and several small ones, the fracture of a rib and several cartilages of others. He was removed to López-Díaz animal hospital where a veterinary operated on him. He was hospitalized for five days and was then taken to the plaintiffs' home. The sutures were cut on the eleventh day and he was then discharged. During the first two days of these injuries the veterinary informed the plaintiff that the prognosis was bad, as a result of which this lady was in a state of grief and suffering during this time because of the uncertainty of whether her beloved dog would survive. The hospital expenses, medicines, and veterinary's fees amounted to $98.

"There is no evidence that the acts herein related were caused by force majeure nor that the fault or negligence of such acts may be attributed to the fox terrier or to his owners.

"CONCLUSIONS OF LAW.—1. Section 1805 of our Civil Code (31 L.P.R.A. § 5144) is clearly applicable to this case. See the cases of Galarza v. G. Llinás & Co., 71 P.R.R. 103, and previous decisions of our Supreme Court on the same matter.

"2. The plaintiff claims compensation for the moral sufferings as a result of seeing her dog injured and in danger of death. She has not been able to cite any judicial precedents on which compensation for such damage may be allowed. However, the arguments which may be adduced in support of her

contention to apply §§ 1802 and 1803 of our Civil Code are so questionable that they produce certain doubt in the trier's mind as to whether it would be advisable to allow it. This is not the proper time for this court to delve into the merits or arguments as to whether or not damages of this type are recoverable. In any event, and in view of the doubt, we should be guided by the general doctrine of the American courts of disallowing compensation for moral sufferings to the owners of dogs which have died or have been injured. See pp. 1345, 1346, and 1347 of 3 C.J.S.

"3. Imminence that the defendants' dogs further attempt to trespass on the plaintiffs' property has not been established. On the contrary, codefendant Robert Leith's dog was found dead three weeks later after the occurrence of the acts involved in this case."

The plaintiffs appealed from the judgment alleging before this Court that the trial court erred (1) "in failing to consider as compensable damage the nuisance suffered by the plaintiffs in the peaceful enjoyment of their property as a result of the invasion and trespassing by the defendants' dogs," and (2) "in failing to consider as compensable damage the physiological and emotional disturbances, including the plaintiff's mental anguish and suffering, which have been duly established, as a result of the acts object of this litigation."

I. The element of damages resulting from nuisance in the enjoyment of their property and the estimated amount of $1,500 were separately and specifically alleged. The complaint prayed for payment of those damages. The uncontroverted testimonies of Domingo Torres and Mrs. Infante established that for about one year the dogs of the defendants—the latter made no attempt to prevent it despite the fact that they had been warned—have trespassed on the home of the plaintiffs causing annoyance to such an extent that on several occasions, when the lady returned home, the two big dogs were lying on her porch and she would not dare

go inside for fear that they would attack her, and she was compelled to remain in her car until they left her property.

Referring to one of the defendants, witness Francisco Rosario Pérez, Justice of the Peace of Guaynabo, testified, uncontradicted, that when he asked him "to leash the dog," the codefendant said: "Of course not, I pay big insurance for that dog and the insurance pays for what the dog may do." (Tr. Ev. 19–20.)

Despite those averments and the pertinent evidence, the trial court made no findings on that part of the claim, nor did the plaintiffs request additional findings under the old Rule 52 (b).

One of the fundamental rights of man recognized by our Constitution is the enjoyment of property; it also recognizes that every person is entitled to the protection of the law against abusive attacks on his private and family life. Article II(7) and (8). Our Civil Code recognizes the right to enjoy and use the things and to be respected in its possession, without further limitations than those established by law. Sections 280, 281, and 375.

The plaintiffs were under no obligation to suffer the annoyances, inconveniences, and nuisances occasioned in their home by the frequent invasions of defendants' dogs, nor to be in constant fear of being suddenly attacked by those animals. We believe that under those circumstances § 277 of the Code of Civil Procedure was applicable. That section provides:

"*Anything which is injurious to health,* or indecent, or offensive to the senses, *or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property, is a nuisance, and the subject of an action.* Such action may be brought by any person whose property is injuriously affected *or whose personal enjoyment is lessened* by the nuisance, and by the judgment the nuisance may be enjoined or abated, *as well as damages recovered.*"    (Italics ours.)

██ II. The defendants did not take convenient and adequate precautions to prevent the dangerous and injurious activities of their animals. They failed to do their duty to take the necessary precautions to prevent damage to the public in general and to their neighbors in particular. In these cases such violation is the proximate and efficient cause of the damage.

Section 1805 of our Civil Code provides:

"The possessor of an animal, or the one who uses the same, is liable for the damages it may cause, even when said animal should escape from him or stray.

"This liability shall cease only in case the damage should arise from *force majeure* or from the fault of the person who may have suffered it."

██ The trial court concluded that the damage did not arise from force majeure nor from Mrs. Infante's fault. Hence, the defendants' strict liability for the damages caused by their animals was absolute. It is a special responsibility borne by the possessor of such animals which rests on a presumption of the implied consent of the possessor to assume all its consequences, since he is well aware of the inefficacy relating to the care and vigilance of irrational beings. It is not necessary to establish their fault or negligence, nor that the animals were fierce, wild, and vicious.[1]

After describing the attack on Nerón on February 14, 1955, and its consequences, the plaintiffs alleged:

"4. The plaintiffs had had in their company their small dog, bestowing upon him care and affection for more than 10 years,

---

[1] See: *Serrano* v. *López*, 79 P.R.R. 922, 926 (1957); *Galarza* v. *G. Llinás & Co.*, 71 P.R.R. 103, 108 (1950); *Beltrán* v. *Heirs of Serrallés*, 70 P.R.R. 81, 83 (1949); *Ruiz* v. *Solís*, 61 P.R.R. 787, 788 (1943); *Vázquez* v. *Laugier*, 60 P.R.R. 404, 405 (1942); *Vélez* v. *Orozco*, 59 P.R.R. 519, 521 (1941); *Andino* v. *Central Victoria, Inc.*, 57 P.R.R. 301, 310 (1940); *Ferrer* v. *Rivera*, 56 P.R.R. 480, 482 (1940); *De Jesús* v. *Arzuaga*, 53 P.R.R. 497, 500 (1938); *Osorio* v. *Taboada*, 52 P.R.R. 780, 784 (1938); *Troche* v. *Matos*, 52 P.R.R. 271, 274 (1937); *Gigante* v. *Alvarez*, 48 P.R.R. 484, 493 (1935); *Torres* v. *Dávila*, 47 P.R.R. 298, 300 (1934); *Colón* v. *Pérez*, 27 P.R.R. 685, 686 (1919); *Redinger* v. *Crespo*, 18 P.R.R. 106, 109 (1912).

and the facts set forth in paragraph 3 of this complaint caused them, particularly to Mercedes Sánchez Infante, intensive moral anguish, nervous disturbances, nuisances, and vexation which the plaintiffs estimated at not less than $1,500. Furthermore, the plaintiffs were compelled to spend over $100 in curing the injuries sustained by their fox terrier."

We have seen already that the trial court stated in its findings, among other things, the following:

"During the first two days of these injuries the veterinary informed the plaintiff that the prognosis was bad, as a result of which this lady was in a state of grief and suffering during this time because of the uncertainty of whether her beloved [2] dog would survive."

---

[2] The following is evidence of Mrs. Infante's feelings for her dog:

"Q.—How did you come into possession of that dog?

"A.—Mr. Quiñones, Judge of Bayamón, gave it to me. He brought it from Miami.

"Q.—How long has that small dog been in your company?

"A.—It has been 10 years with us.

"Q.—Lady, will you explain to the court the treatment and care which that dog received in your house, since he arrived to this date.

"A.—I consider him as a child in the family. I take care of him as if he were a child. He has a special room to himself.

"Q.—Lady, do you look after the food for that dog?

"A.—I prepare it myself.

"Q.—The food for that dog has consisted of what?

"A.—He has never been very fond of canned meat; he has always eaten beef ribs and the like.

"Q.—Is that food given free for him?

"A.—No, sir. I purchase it myself.

"Q.—Why?

"A.—Because I like to choose it myself. I choose it myself because if you ask for two pounds of meat dog, what they give you is offal and he likes ribs very much, what they call brisket.

"Q.—Brisket?

"A.—Yes, loin. And I cook it myself and I serve it to him myself.

"Q.—Has that dog ever slept out of your house other than the time he was in Dr. López Pacheco's hospital?

"A.—Never. He has his small room. He has a rug, not a hot one made of plush, but one of those made of threads.

"Q.—Who bathes him personally?

"A.—I bathe him myself.

"Q.—Has he ever been sick?

The evidence for the plaintiffs further established that Mrs. Infante was in the basement of her house when Nerón was attacked by Blackie and Pennie; that the attack took place in the yard; that she heard "all of a sudden a squable as when two dogs are fighting," and ran outside and asked witness Domingo Torres to set them apart; that she did not do it herself for fear "that they would jump upon me." According to Torres' testimony, when he took the injured dog to the garage "Mrs. Infante became so nervous that she had a serious shock." The veterinary testified that Nerón "recovered sufficiently to survive, but not to look healthy thereafter," and that it was very unlikely that it would become a healthy animal again.[3]

---

"A.—Only once, in November, he got sick and I took him to Dr. López Pacheco.

"Q.—When was that?

"A.—In November 1954. I took him immediately to Dr. López Pacheco and he told me it was bronchitis.

"Q.—Was the doctor's treatment free of charge?

"A.—No, sir. I paid him.

"Q.—You said that you loved that dog as if he were a member of the family?

"A.—Yes, sir, like a child.

"Q.—Who else lives in your house?

"A.—Well, my daughter and my husband.

"Q.—Is your daughter already a grownup?

"A.—A lady.

"Q.—Did you take the dog out for a walk?

"A.—As a rule I did not take him out on the street because I was afraid a dog would injure him. I always took him out in the car for a ride.

"Q.—About how many times a week?

"A.—Sometimes twice a week, whenever I can.

"Q.—Is that dog a mongrel?

"A.—Well, he gives that impression. And I don't like it when they call him mongrel because in fact he is not. He looks like one." (Tr. Ev. 36–38.)

[3] As to plaintiff's mental anguish, we copy the following from the transcript:

"Q.—Lady, will you answer the question:

As a result of seeing the attack on your dog by these two other big dogs which have been mentioned here, as a result of seeing that and what happened to your dog, what happened to you?

"A.—I was sick for more than two weeks.

34

As has been seen, the trial court refused to allow compensation for "the moral sufferings resulting from seeing her dog injured and in danger of death." It said "that they produce certain doubt in the trier's mind as to whether it would be advisable to allow it," and that in view of such doubt "we should be guided by the general doctrine of the American courts of disallowing compensation for moral sufferings to the owners of dogs which have died or have been injured."

■ We believe that the moral sufferings claimed herein are (1) those experienced by Mrs. Infante solely as the result of the assault on her dog practically in her immediate presence, and (2) those experienced as a result of seeing her dog injured and afterwards being practically useless.

"Q.—What was wrong with you?
"A.—My nervous system was upset. I could not even drive the car.
"Q.—Did you eat well?
"A.—I could not eat.
"Q.—Did you sleep well?
    "JUDGE: Please, let her explain.
    "PLAINTIFF:
"Q.—Please tell the court everything that happened to you.
"A.—Your Honor, I could not sleep. I did not sleep a wink the night I took the dog to the hospital with my daughter; I was early in the hospital to find out if he would survive or die, because the doctor said that he had done all that was humanly possible to save him but that he was not sure. And the next day also; when my husband came home for lunch I could not even wait on him, because, can you imagine, when my daughter left for Spain that dog was my companion.
"Q.—How was your state of mind?
"A.—Well, I tell you, the nervous system . . . well, I could not do anything. I had a headache; my husband had to give me injections."

Upon examination by the defendant, the Justice of the Peace of Guaynabo testified in part:

"Q.—Did you notice if she was nervous there?
"A.—Yes, she was a little hysterical.
"Q.—When you say hysterical, what do you mean to say?
"A.—That she looked as if there were tears in her eyes; she showed the restlessness of a woman who loses something which she loves." (Tr. Ev. 45–46 and 66.)

█ We need not abide by the universal rule that every unlawful act of man which causes damage to another, performed intentionally or negligently, is cause for liability, to conclude that in both aspects the lady's moral sufferings are compensable. The reality of those damages has not been questioned. The wide range of our § 1805 leaves no doubt on the propriety of compensating in these cases all damages actually sustained, whether immediately or directly, or mediately or indirectly, which possibly and necessarily flow or result from the injurious act. It does not distinguish between the types of compensable damages.

█ In *Ruiz* v. *Solís*, 61 P.R.R. 787 (1943), we affirmed the judgment appealed from allowing compensation for "physical sufferings and mental anguish" caused by the acts of a dog, the services of which were used by the defendant. In *Vélez* v. *Orozco*, 59 P.R.R. 519 (1941), damages were claimed for "acute nervous spells" suffered by the plaintiff as a result of an attack by a dog, and we affirmed the judgment allowing such damages. We also affirmed in *Gigante* v. *Álvarez*, 48 P.R.R. 484 (1935), allowing compensation for "intense nervous spells, uneasiness, insomnia, restlessness, mental and moral anguish" suffered as a result of acts of a police dog called Nerón.

Sometime ago we criticized the common-law doctrine which requires that there must be an "impact" before moral or mental damages can be recovered, as being obsolete and failing to protect an important interest of the human personality. *Rivera* v. *Rossi*, 64 P.R.R. 683, 690 (1945); *Vázquez* v. *People*, 76 P.R.R. 556, 562 (1954); see *Hernández* v. *Fournier*, 80 P.R.R. 94, 99 (1957); and *Cáez* v. *U.S. Casualty Co.*, 80 P.R.R. 729, 735 (1958).[3a]

█ A court has no absolute discretion to refuse or grant in its sound judgment reparation for the damages

---

[3a] See the interesting summary on American law of moral damages made by Professor HOWARD L. OLECK in his recent work "Damages to Persons and Property" 252–53 (Central Book Co., N.Y., 1955).

caused, except in conformance with the findings made. We realize that the compensatory operation becomes more difficult when elements which are not so manifest as the physical damage or injury come into play in the economic estimation. However, if it is found that the damages have been caused and that they are the immediate or mediate consequence of the injurious act, or that somehow they are necessarily derived therefrom, the compensable economic *quantum* should be determined taking into consideration the specific circumstances of each case. However, when there is a subjective element in the quantitative determination of the damages—such as the sentimental, affectional value, or attachment to the thing—the trier is constantly exposed to an exaggerated relation on the part of the plaintiff. But, as stated in *Arcelay* v. *Sánchez*, 77 P.R.R. 782, 807 (1955), the determination of the necessary and just amount to compensate the damages rests with the sound judgment, experience, and discretion of the trier.

▬ Is it proper to compensate the mental anguish suffered by Mrs. Infante in seeing her dog injured, in danger of death, and later becoming useless? We hold that it is. We conceive of no logical reason or principle of justice which would persuade us to hold otherwise.

▬ In our legislation animals are considered as objects of law, susceptible of forming part of real and contractual relations.[3b] They are part of the private property. Inherent in them as well as in any other property owned by

---

[3b] "In ancient legislations animals were considered, in some instances, as subjects of law, especially subjects of offense. During the Middle Ages trials against animals surrounded by formulisms and procedural systems were frequent. In these proceedings against leeches, rats, lobsters, etc., these animals were summoned by edicts, their default was entered, and judgment was rendered decreeing their extermination.

"In Spain, during the Middle Ages, proceedings against animals were held, and in the historical law there are some statutes exacting liability from animals and in others exempting them, the assumption being that they did not exclude the possibility of considering animals as subjects of law." II *Nueva Enciclopedia Jurídica* 670–71.

man is the right of enjoyment, which is a "fundamental right of man." Constitution, Art. II(7). The affection and fondness for the small dog, the pleasure and enjoyment which his company afforded to her for 10 years, were a reflection or manifestation of that enjoyment. The sorrow and anguish which Mrs. Infante experienced, according to the evidence, were necessarily the result of the invasion against that sentimental property. As stated by the trial judge, the plaintiff was "in a state of grief and suffering during this time in view of the uncertainty whether her beloved dog would survive." And as correctly stated by the justice of the peace in referring to her: ". . . she looked as if there were tears in her eyes; she showed the restlessness of a woman who loses something which she loves."

Section 1802 did not apply to the case. It would have if it had been shown that the dogs had been previously and deceitfully instigated by their owners to cause the damages. See XXXI SCAEVOLA 514 (1961 ed.).

The circumstances present in *Díaz* v. *Palmer*, 62 P.R.R. 106, and *Díaz* v. *Emanuelli*, 61 P.R.R. 857, invoked by the appellees, are not analogous to those in the instant case. The mere destruction of a small and vacant shack covered with cane straw, purchased for $15 in the first case, and the alleged loss of fruits and of two animals not due to acts of the defendants but to the conduct of the plaintiff himself in the latter case, could not cause the very remote moral damages claimed in both cases in which the defendants had been exonerated from all liability for the material damages. We disallowed compensation therein under the provisions of § 1058, which provides that "no one shall be liable for events which could not be foreseen, or which having been foreseen were inevitable, with the exception of the cases expressly mentioned in the law or those in which the obligation so declares." Under § 1805, the possessor of an animal is liable for the damages it may cause "even when said animal should escape from him or

stray." In other words, whether the event causing the damage is foreseeable or avoidable, or unforeseeable or unavoidable, he is nonetheless liable for the damages, except, of course, if the damage arises from force majeure or from the fault of the party who may have suffered it. See 12 MANRESA 679 (5th ed. 1951). It is not necessary to prove, as claimed by the appellees, that the owner of the animal is aware that it is dangerous to leave it at large and permits it nonetheless to rove around freely without taking the necessary precautions, nor that the animal has vicious habits. Furthermore, evidence of the proper diligence of a good father of a family required under the last paragraph of § 1803, is not admissible in this type of damages. See the cases of *Beltrán* v. *Heirs of Serrallés* and *Ferrer* v. *Rivera, supra.*

In view of the foregoing, we hold that the trial court committed the errors assigned by the appellants, and that, taking into consideration the circumstances of the case, the judgment should be modified so as to grant to the appellant spouses, in addition to the amounts adjudicated for expenses incurred in the treatment of their dog and attorney's fees, the additional sum of $1,500 for all the damages sustained by them, and, as thus modified, the judgment appealed from will be affirmed.[4]

---

[4] We can not overlook the unusual statement by the trial judge that "in view of the doubt, we should be guided by the general doctrine of the American courts of disallowing compensation for moral damages to the owners of dogs which have died or have been injured."

It is true that it has always been the tendency of this Court to recognize to the citizens the full benefit of the juridical systems—the American Common Law and the Civil Law—until one is created which embodies the most just of both—*cf. Sosa* v. *Morales*, 58 P.R.R. 362, 365 (1941)—and that it has accepted as a good guide for the statutory exegesis the interpretation placed upon a law by the highest court of the state from which it is taken; yet, with very few exceptions, it has always been reluctant to adopt doctrines and principles consecrated by the American courts which are in fundamental conflict with our juridical tradition and our way of life as a community.

Section 7 of our Civil Code provides in its second paragraph that when there is no statute applicable to the case, the court shall decide in accordance with equity, which means that natural justice, as embodied in the general principles of jurisprudence and in accepted and established

usages and customs, shall be taken into consideration.  As has been seen, there are many statutory provisions applicable to the case and in many of our decisions there are many precedents for the resolution of the problem raised.  We have never considered in Puerto Rico as supplementary law "the general doctrine of the American courts" relative to any juridical problem.